## IN THE UNITED STATED DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CYBERX GROUP, LLC and | § | |
| DAVID E. LINDSEY | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Case No. _____ |
| | § | |
| CHRISTOPHER PEARSON and | § | JURY DEMANDED |
| CYBERX, LLC, | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

CyberX Group, LLC and David E. Lindsey (collectively, "Plaintiffs") file this Original Complaint against Christopher Pearson and CyberX, LLC (collectively, "Defendants") and would respectfully show as follows:

### INTRODUCTION

1.      Plaintiff David Lindsey invested heavily in Defendant CyberX LLC to further a mutual interest with Defendant Christopher Pearson in developing software for both the healthcare/insurance and other industries. That mutual interest caused Mr. Lindsey and Pearson to form Defendant CyberX Group LLC ("CXG"), which was a spinoff of the business focused on a healthcare/insurance platform.

2.      Despite years of substantial contribution of money, time, industry know-how, and energy into both entities, Pearson turned on Mr. Lindsey and CXG. Specifically, on August 10, 2020, after abruptly resigning his position of President of Plaintiff CXG, legal counsel for Defendants Christopher Pearson and CyberX LLC informed Mr. Lindsey that (1) Plaintiffs had no

ownership rights in the software that it funded; (2) Defendants intended to take CXG's business through such software, even naming the two current clients of CXG that Defendants intended to pilfer; and (3) Defendants believed CXG "isn't worth anything."

3.      Plaintiffs bring this Complaint to adjudicate their rights to the software in question, establish through judicial order rights in the entities at issue, prevent any further misuse of the same, and to obtain compensation for damages arising out of Defendants' unlawful conduct.

## PARTIES

4.      CyberX Group, LLC ("CXG") is a Texas limited liability company with its principal place of business in Dallas County, Texas.

5.      David Lindsey ("Lindsey") is a United States citizen and citizen of the State of Texas that resides in Dallas County, Texas.

6.      Defendant Christopher Pearson ("Pearson") is an individual citizen of the State of Idaho that resides in Kootenai County, Idaho.

7.      Defendant CyberX, LLC ("CyberX") is an Idaho limited liability company that may be served through its registered agent, Christopher Pearson, at 7472 N 15th St., Dalton Gardens, Idaho, 83815.

## JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over Defendants because Defendants' actions giving rise to this suit took place in Texas and were knowingly directed at entities and individuals in Texas, all of whom felt the effects in Texas.

9.      This Court has federal-question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). Specifically, this complaint includes actions under the Copyright Act. This Court also has subject matter jurisdiction over CXG's federal trade secret claim pursuant to 18 U.S.C. §§ 1836-39 *et seq*. and 28 U.S.C. §§ 1331 and 1343.

10.     This Court has supplemental jurisdiction over all non-federal questions under 28 U.S.C. § 1367 as the claims are so related to those over which the court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court also has jurisdiction over Plaintiffs' claim for relief pursuant to the provisions of the Declaratory Judgment Act, 28 U.S.C. § 2201.

12.     Venue is proper under 28 U.S.C § 1391(b)(2) because all of the events giving rise to this suit took place in the Northern District of Texas.

## FACTS

**A.      Lindsey rescues Pearson's failing business**

13.     In late 2016, Pearson informed Lindsey that he was failing in his current venture of CyberX LLC, which was unsuccessfully attempting to develop software for multi-level marketing ("MLM") companies. Lindsey nevertheless saw value in Pearson, who he believed could create software for use in the healthcare industry, e.g., Mr. Lindsey's companies.

14.     In January 2017, Pearson decided to abandon the MLM software business, and instead enter into business with Mr. Lindsey to develop software for the healthcare and insurance industries.

15.     Pearson agreed to provide Mr. Lindsey a 50% interest in his solely owned Limited Liability Company—Defendant CyberX, LLC—and, in exchange, Mr. Lindsey would provide critical and foundational financial support to the company, including but not limited to Lindsey's business experience, lease, servers, and labor necessary to develop such software. The venture would create software directed to the healthcare/insurance industry (and eventually into the MLM industry). It would first offer a web portal for various types of clients and for various healthcare related services.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                          **Page 3**

16.    The initial iteration of this software and platform would be provided for Mr. Lindsey's companies Agentra LLC and MyHealthPass LLC.

17.    In 2017-2018 Mr. Lindsey financially supported CyberX through his companies in amounts between $11,000-$30,000 per month. From the invoices sent by CyberX to Lindsey, Lindsey, through his companies, paid for programming services (from Pearson as well as other developers), an office lease in Idaho, and all other expenses incurred by CyberX. While CyberX developed the software, it received technical input (including actual code development) from the employees of Lindsey's companies. Pearson reported to Mr. Lindsey and was even given the title "Chief Information Officer."

18.    One of the Agentra employees that Mr. Lindsey dedicated to the healthcare platform project was Troy Van Zile ("Van Zile"), who had been hired by Mr. Lindsey in August 2017 specifically to work on Lindsey's behalf for the healthcare platform development. Van Zile was tasked with being the liaison and "on the ground" development manager executing on the design, functionality, and performance operations of the healthcare platform and worked so closely with Pearson that he became an integral figure in the healthcare platform.

19.    Pearson relied heavily on Van Zile to move development of the healthcare platform forward. However, Van Zile remained an employee of one of Mr. Lindsey's companies.

**B.    The formation of CyberX Group LLC**

20.    Despite Mr. Lindsey's financial and business support of CyberX, just over a year later, in January 2018, Pearson wanted Mr. Lindsey to change the agreement. Pearson stated that he would not be motivated or able to move forward with the project in the long term unless they formed a separate entity, CyberX Group, LLC for the healthcare platform that would be co-owned by Lindsey, Pearson, and Van Zile.

21.     As leverage, during a first quarter 2018 meeting in Dallas, Pearson claimed sole ownership of all of the intellectual property, including software, trade secrets, and copyrights that he had thus far overseen as the manager of the venture, despite the entirety of the progress and development being a result of Mr. Lindsey's financial investment and advice. Naturally, Mr. Lindsey objected.

22.     Ultimately, Pearson and Mr. Lindsey reached a partial resolution: spin off the healthcare portion of CyberX into Plaintiff CyberX Group LLC ("CXG"). Pursuant to the July 10, 2018 membership agreement, Lindsey, Pearson, and Troy Van Zile would be the sole members, owning 70%, 20%, and 10% of CXG, respectively. *See* Ex. A (CXG Company Agreement). The agreement was made retroactive to March 17, 2017 to cover the time of development up until the signing. *Id*. at 1. Mr. Lindsey continued his monthly capital investments for the venture, and Pearson continued to provide the "sweat" equity involved in running the company and coordinating development of the software assets.

23.     Notably, with the understanding that CXG would be primarily a technology development company, central parts of the CXG membership agreement included a provision protecting CXG's trade secrets (Sec. 3.6(B)) and a provision prohibiting members from directly competing with the company while they owned an interest. (Sec. 4.12).

C.     **Lindsey continues to invest into CXG**

24.     Pearson was, at all times relevant, President and CEO of CXG. CXG received monthly capital payments from or on behalf of Mr. Lindsey in amounts ranging between $25,000-$35,000 per month. CXG is the named tenant on a commercial lease on a company facility located at 1677 E. Miles Ave., Hayden Lake, Idaho 83835, where Pearson and other CXG employees are officed.

25.     As President, Pearson was entrusted with the primary responsibility for overseeing these offices and employees on behalf of CXG. CXG maintained a corporate bank account with Bank of America, over which Pearson had direct control. In addition to day-to-day operating expenses, during his tenure as President, Pearson wrote himself $10,000 checks payable to himself, presumably as payment for his services as President. Throughout, Mr. Lindsey trusted Pearson with the operation of CXG in its mission to develop the healthcare software.

26.     Development of the healthcare platform continued, and an initial version of the software was completed in approximately April 2018 ("Healthcare 212"). Ultimately, CXG was successfully able to market the product to American Workers Insurance Services, Inc. ("AWIS") and Coterie Advisory Group, Inc. ("Coterie"), with whom they entered into Platform Services Agreements (the "AWIS PSA" and "Coterie PSA," respectively). These agreements remain in effect to this day, and monthly income from these agreements are critical to CXG's revenue stream.

27.     Following the meaningful progress and deployment of Healthcare 212, Mr. Lindsey and Pearson planned for development of a second version of the healthcare platform ("2.0"). Simultaneously, as discovered later by Mr. Lindsey, Pearson and CyberX began developing a new multi-level marketing platform based on the ideas, workflows, and designs Mr. Lindsey and his employees had contributed for the healthcare platform.

**D.     Lindsey and Pearson unsuccessfully attempt to part ways**

28.     Through 2019 and 2020 Pearson and Van Zile failed to deliver the 2.0 platform and software in working order, or on time. With excuses abound, the relationship between Mr. Lindsey and Pearson soured and it was decided that they should finally part ways. They began negotiations on how best to accomplish this and divide their interests, starting with CXG. Negotiations were ongoing only a few weeks ago.

29.     On August 4, 2020, during these negotiations, Defendants' attorney admitted that a certain Cloudflare account "is a Cyber X Group account and should be in [CXG's] possession." That Cloudflare account controls[1] at least the following domain names (inclusive of any subdomains, hereinafter, the "CXG Domains"):

- ahs212.com

- awisplatform.com

- campushealthpass.com

- cyberxgroup.com

- diabeticinspros.com

- diabeticinspros.net

- fbshealthpass.com

- fchealthplans.com

- ffalternative.com

- healthcare212.com

- mahcacaptive.com

- myhealthpass.com

- plans212.com

- products212.com

- prosmarte.com

- sf212.io

- smarteapp.com

---

[1] The Cloudflare account directs users who type in the any domain names under its control to the actual server which runs software that operates a given website.

- uphealthpass.com

30.     On August 10, 2020, Defendants, by way of their attorney, delivered a letter claiming and asserting the following: (1) Pearson and CyberX LLC maintained sole ownership of all of the intellectual property developed by CXG; (2) CXG's clients AWIS and Coterie would be solicited by Pearson through CyberX, LLC, following his withdrawal as President and member of CXG; and (3) CXG "isn't worth anything" despite years of investment by Mr. Lindsey and management by Pearson as its President. *See generally* Ex. A (Zimmerman Letter). In short, these declarations describe Pearson's calculated intention to (a) rewrite history such that CXG would exist today decapitalized of all of its IP assets despite over one million dollars of investment by Lindsey, and (b) also steal all of CXG's clients utilizing either the IP assets of CXG or a stolen version of them in CyberX.

31.     Meanwhile, Pearson has continued to (a) operate out of the offices owned by CXG, (b) withdraw funds from CXG's accounts, and (c) as recently as last week, accessed the 2.0 software developed for CXG that resides on cloud service accounts owned by CXG.

32.     An immediate accounting of CXG's bank records further uncovered that Pearson, in addition to the $10,000 payments to himself, had been paying CyberX $20,000 per month. The purpose or reason behind these separate payments can only be construed as a long running scheme of self-dealing by which Pearson had been paying himself upwards of $30,000 of CXG funds with the intention of one day pirating all of CXG's assets.

## COUNT I: BREACH OF FIDUCIARY DUTY
### (CXG against Pearson)

33.     Plaintiffs incorporate the foregoing allegations as though fully restated herein.

34.     Pearson was an officer (president) and member of CXG. As a CXG member and officer he owed CXG a fiduciary duty.

35.     Pearson breached his fiduciary duties, including but not limited to the duties of full disclosure, loyalty, and abstention from self-dealing.

36.     Examples of such breaches include: (1) misappropriating trade secret information and other intellectual property of CXG; (2) competing with CXG by soliciting or threatening to solicit CXG's clients AWIS and Coterie for CyberX's benefit; and (3) self-dealing with CyberX.

37.     As the proximate and direct result of Pearson's breach of fiduciary duty, CXG has suffered actual and consequential damages.

38.     CXG seeks such damages, along with disgorgement of all benefits obtained by Pearson arising from these breaches, and CXG's attorneys' fees, costs, prejudgment interest, and post-judgment interest.

39.     CXG also seeks a constructive trust on all proceeds, funds, or property obtained as a result of Pearson's breach of fiduciary duty.

## COUNT II: BREACH OF CONTRACT
### (Lindsey against Pearson)

40.     Plaintiffs incorporate the foregoing allegations as though fully restated herein.

41.     The CXG Company Agreement constitutes a binding and enforceable contract.

42.     Lindsey has performed or tendered performance of all of its obligations in connection with the CXG Company Agreement.

43.     The covenant against competition at Section 4.12 is an enforceable covenant not to compete under Texas law.

44.     Pearson has threatened to violate and/or violated the covenant against competition by soliciting CXG's clients, including but not limited to AWIS and Coterie.

45.     As a second basis for Pearson's breach of the CXG Company Agreement, Section 3.6(B) contains a confidentiality provision. *See* Ex. A (CXG Company Agreement) at § 3.6(B).

46.     Pearson has threatened to violate and/or violated the confidentiality provision by disclosing confidential CXG information to persons other than members of CXG.

47.     As a direct and proximate result of Pearson's breaches of the covenant against competition and confidentiality provision, Lindsey is suffering, and will continue to suffer, immediate and irreparable harm for which no there is no adequate remedy at law, as well as incur substantial monetary damages.

## COUNT III: DECLARATORY JUDGMENT of copyrights related to CXG Domains
### (CXG against all Defendants)

48.     Plaintiffs incorporate the foregoing allegations as though fully restated herein.

49.     There is a real and actual controversy between CXG on one hand and Pearson and CyberX on the other regarding CXG's ownership in the copyrights related to the CXG Domains.

50.     Specifically, Defendants' August 10 letter asserts that software already on CXG cloud servers, e.g., the "Healthcare 212" (which, on information and belief, corresponds to the software powering the website healthcare212.com) and "Smarte" software (which, on information and belief, corresponds to the software powering the website smarteapp.com) is "the intellectual property of Mr. Pearson through CyberX, LLC" and, by extension, not property of CXG. *See* Ex. A (Zimmerman Letter) at 1-2.

51.     CXG seeks a declaratory judgment that all source code, graphics, and other works created by Pearson and CyberX related to the CXG Domains, including but not limited to the "Healthcare 212" and "Smarte" software referenced in Defendants' letter, were works made for hire such that copyright ownership vests in CXG.

## COUNT IV: VIOLATION OF DEFEND TRADE SECRETS ACT
### (CXG against all Defendants)

52.     Plaintiffs incorporate the foregoing allegations as though fully restated herein.

53.     CXG owns and possesses confidential, proprietary, and trade secret information, including but not limited to the source code powering the webservers for the CXG Domains, lists of potential improvements and bug fixes to such source code, knowhow, use cases and procedures, and lists of customers and potential customers for CXG.

54.     CXG has taken reasonable measures to keep such information secret and confidential. For example, the CXG Company Agreement contains a provision instructing members to hold in strict confidence all trade secret information.

55.     CXG's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

56.     In violation of CXG's rights, Defendants misappropriated CXG's confidential, proprietary and trade secret information in an improper and unlawful manner. On information and belief, Defendants have copied the source code powering the webservers for the CXG Domains to their own computers and solicited or threatened to solicit CXG's potential customers. Defendants' misappropriation of CXG's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Defendants have attempted and continue to attempt to conceal their misappropriation.

57.     On information and belief, if Defendants are not enjoined, Defendants will continue to misappropriate and use CXG's trade secret information for their own benefit and to CXG's detriment.

58.      As the direct and proximate result of Defendants' conduct, CXG has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable

injury, and significant damages, in an amount to be proven at trial. Because CXG's remedy at law is inadequate, CXG seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. CXG's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

59.     CXG has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorney's fees.

### COUNT V: VIOLATION OF TEXAS UNIFORM TRADE SECRETS ACT
### (CXG against all Defendants)

60.     Plaintiffs incorporate the foregoing allegations as though fully restated herein.

61.     CXG owns and possesses information that constitutes trade secrets as defined by the Texas Uniform Trade Secrets Act, including but not limited to the source code powering the webservers for the CXG Domains, lists of potential improvements and bug fixes to such source code, knowhow, use cases and procedures, and lists of customers and potential customers for CXG.

62.     CXG has taken reasonable efforts to keep such information secret and such information has actual or potential independent value to third parties.

63.     In violation of CXG's rights, Defendants misappropriated CXG's confidential, proprietary and trade secret information in an improper and unlawful manner.

64.     On information and belief, Defendants have copied the source code powering the webservers for the CXG Domains to their own computers and solicited or threatened to solicit CXG's potential customers.

65.     Defendants knew or should have known under the circumstances that the information misappropriated by Defendants were trade secrets.

66.     CXG has taken reasonable measures to keep such information secret and

confidential. For example, the CXG Company Agreement contains a provision instructing members to hold in strict confidence all trade secret information.

67.     As the direct and proximate result of Defendants' conduct, CXG has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because CXG's remedy at law is inadequate, CXG seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. CXG's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

68.     CXG has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorney's fees.

## COUNT VI: TORTIOUS INTERFERENCE
### (CXG against CyberX for interference with AWIS PSA)

69.     Plaintiffs incorporate the foregoing allegations as though fully restated herein.

70.     The AWIS PSA constitutes a binding and enforceable contract. CyberX is not a party to this contract.

71.     CyberX willfully and intentionally interfered with the compliance to the covenant against competition contained in the AWIS PSA.

72.     As a direct and proximate result of CyberX's willful and intentional interference, CXG is suffering, and will continue to suffer, immediate and irreparable harm for which no there is no adequate remedy at law, as well as incur substantial monetary damages.

## COUNT VII: TORTIOUS INTERFERENCE
### (CXG against CyberX for interference with Coterie PSA)

73.     Plaintiffs incorporate the foregoing allegations as though fully restated herein.

74.     The Coterie PSA constitutes a binding and enforceable contract. CyberX is not a party to this contract.

75.     CyberX willfully and intentionally interfered with the compliance to the covenant against competition contained in the Coterie PSA.

76.     As a direct and proximate result of CyberX's willful and intentional interference, CXG is suffering, and will continue to suffer, immediate and irreparable harm for which no there is no adequate remedy at law, as well as incur substantial monetary damages.

### COUNT VIII: DECLARATORY JUDGMENT OF LINDSEY'S OWNERSHIP OF 50% MEMBERSHIP INTEREST IN CYBERX LLC

77.     Plaintiffs incorporate the foregoing allegations as though fully restated herein.

78.     There is a real and actual controversy between Lindsey and CyberX regarding whether Lindsey owns a 50% membership interest in CyberX in consideration for Lindsey's financial support. Specifically, Defendants' August 10 letter asserts that "Mr. Lindsey began, inaccurately, suggesting that he had an ownership interest in Mr. Pearson's company (CyberX, LLC)."

79.     Lindsey seeks a declaratory judgment that he owns a 50% membership interest in CyberX, LLC.

### COUNT IX: BREACH OF IDAHO UNIFORM LIMITED LIABILITY COMPANY ACT
### (Lindsey against CyberX)

80.     Plaintiffs incorporate the foregoing allegations as though fully restated herein.

81.     Pursuant to Lindsey's agreement with Pearson, Lindsey has a 50% membership interest in CyberX in exchange for his financial support.

82.     On information and belief, CyberX has made distributions to Pearson in an amount unknown at this time.

83.     Under the Idaho Uniform Limited Liability Company Act 30-25-404, any distributions made by CyberX "must be in equal shares among members and persons dissociated as members."

84.     As a 50% member of CyberX, Lindsey was entitled to distributions in proportion to his ownership interest.

85.     CyberX breached Idaho Uniform Limited Liability Company Act 30-25-404 by failing to make such distributions to Lindsey.

**COUNT X: BREACH OF FIDUCIARY DUTY**
**(Lindsey against Pearson)**

86.     Plaintiffs incorporate the foregoing allegations as though fully restated herein.

87.     As manager of CyberX, Pearson owned the other member of CyberX (i.e., Lindsey) a fiduciary duty.

88.     Pearson breached his fiduciary duties, including but not limited to the duties of full disclosure, loyalty, and abstention from self-dealing by, e.g., attempting to cut Lindsey out of his 50% membership interest in CyberX, failing to inform Lindsey that he made distributions to himself, and failing to make the distributions required by the Idaho Uniform Limited Liability Company Act to Lindsey.

89.     As the proximate and direct result of Pearson's breach of fiduciary duty, Lindsey has suffered actual and consequential damages.

90.     Lindsey seeks such damages, along with disgorgement of all benefits obtained by Pearson arising from these breaches, and Lindsey's attorneys' fees, costs, prejudgment interest, and post-judgment interest.

91.     Lindsey also seeks a constructive trust on all proceeds, funds, or property obtained as a result of Pearson's breach of fiduciary duty.

## PRAYER

WHEREFORE, Plaintiffs respectfully request the following relief:

1.       Judgment in Plaintiffs' favor and against Defendants on all causes of action alleged herein;

2.       For preliminary and permanent injunctive relief;

3.       For judgment that this is an exceptional case;

4.       For punitive damages;

5.       For restitution;

6.       For costs of suit incurred herein;

7.       For prejudgment interest;

8.       For such other and further relief as the Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Dated: August 24, 2020                    Respectfully submitted,

**PLATT CHEEMA RICHMOND PLLC**

*/s/ Matthew C. Acosta*
William S. Richmond
Texas Bar No. 24066800
brichmond@pcrfirm.com
Matthew C. Acosta
Texas Bar No. 24062577
macosta@pcrfirm.com
Andrew Lin
Texas Bar. No. 24092702
alin@pcrfirm.com
**PLATT CHEEMA RICHMOND PLLC**
1201 N. Riverfront Blvd., Suite 150
Dallas, Texas 75207
214.559.2700 Main
214.559.4390 Fax

**COUNSEL FOR PLAINTIFFS**