UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CYBERX GROUP, LLC and<br>DAVID E. LINDSEY<br><br>　　Plaintiffs,<br><br>v.<br><br>CHRISTOPHER PEARSON and<br>CYBERX, LLC,<br><br>　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:20-CV-2501-B |

## MEMORANDUM OPINION & ORDER

Before the Court is Plaintiffs CyberX Group, LLC and David E. Lindsey's Motion for Temporary Restraining Order (TRO) (Doc. 7). After considering the parties' briefing and oral arguments at a hearing on the motion held on September 8, 2020, the Court **DENIED** Plaintiffs' motion on the grounds that Plaintiffs failed to demonstrate a substantial likelihood of success on the merits of their claims. This Order further explains the Court's reasoning.

### I.

### BACKGROUND[1]

Defendant Christopher Pearson established CyberX, LLC (Defendant "CyberX") in 2013 to develop and market software for multi-level-marketing (MLM) companies. Doc. 12, Defs.' Resp., 2. At least until 2017, Pearson was the sole owner of CyberX. *See id.*; Doc. 7, Pls.' Mot., 7. In early

---

[1] The facts are drawn from Plaintiffs' TRO motion and the parties' briefing. *See* Doc. 7, Pls.' Mot.; Doc. 12, Defs.' Resp.; Doc. 14, Pls.' Reply. Unless otherwise indicated, the Court has omitted the parties' citations to the appendices.

2017, Plaintiff David Lindsey entered into a relationship with Pearson and CyberX wherein Lindsey's healthcare companies, Agentra, LLC and MyHealthPass, LLC, issued monthly payments to CyberX in amounts between $11,000 and $30,000. Doc. 7, Pls.' Mot., 7; Doc. 12, Defs.' Resp., 3. In return, CyberX modified its MLM software to fit the needs of healthcare services and provided the software to Agentra and MyHealthPass. Doc. 7, Pls.' Mot., 7; Doc. 12, Defs.' Resp., 3.

In January 2018, Pearson emailed Lindsey, expressing his desire to form a separate entity, CyberX Group, LLC (Plaintiff "CXG"), with ownership to be split 70/20/10, respectively, between Lindsey, Pearson, and Troy Van Zile—an Agentra employee involved with the software development at CyberX. Doc. 7, Pls.' Mot.,7–8. On March 22, 2018, Pearson and Lindsey signed a handwritten agreement on a single sheet of ruled paper (the "March 22 Agreement"), indicating the aforementioned ownership division of CXG and seemingly designating Pearson as the sole owner of CyberX. Doc. 12-1 Defs.' App., Ex. J. On July 10, 2018, Lindsey, Pearson, and Van Zile executed a more formal and detailed "Company Agreement of CyberX Group LLC" ("Company Agreement"), which was backdated to March 14, 2017. Doc. 12-1, Defs.' App., Ex. L, 1, 30. Two provisions are relevant for Plaintiffs' motion for a TRO. Section 3.6(B) of the Company Agreement provides:

> **Confidentiality** . . . . Each Member shall hold in strict confidence any information that it receives concerning [CXG] that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member, except for [exceptions listed].

Doc. 8-7, Pls.' App., Ex. G, 9. Section 4.12 of the Company Agreement provides:

> **Conflicts of Interest** . . . . [E]ach Manager, Member and officer of [CXG] at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, save and except for ones in competition with [CXG], with no obligation to offer to [CXG] or any other Member, Manager, or officer the right to participate therein.

*Id.* at 11.

Once formed, CXG obtained a commercial lease for an Idaho office as well as a corporate bank account, both of which CXG currently possesses. Doc. 7, Pls.' Mot., 9; *see* Doc. 12, Defs.' Resp., 3, 6. Pearson served as CXG's president for two years after CXG's formation, working primarily in the Idaho office. Doc. 7, Pls.' Mot., 9. During his time as president, Pearson oversaw the development of software, cumulating in a product that Plaintiffs refer to as "Healthcare 212." *Id.* at 10. CXG executed two contracts to provide this software (or tailored versions of it) to American Workers Insurance Services, Inc. (AWIS) and Coterie Advisory Group, Inc. ("Coterie"). *Id.* These contracts remain in effect and serve as crucial sources of CXG's income. *Id.*

After the success of Healthcare 212, Lindsey and Pearson planned for development of a second version ("HC 2.0"), which was originally promised to Lindsey by Fall 2019. *Id.* Pearson did not deliver HC 2.0. *Id.* According to Plaintiffs, Pearson was not working on HC 2.0, but was instead developing new MLM software for CyberX based on the ideas and designs that had been developed for Healthcare 212. *Id.* Defendants contend, however, that Pearson did not deliver HC 2.0 because Lindsey failed to fund the project as promised. *See* Doc. 12, Defs.' Resp., 5–6. According to Defendants' brief and responses at the hearing, CXG was in such financial distress that it had terminated all of its employees by the middle of 2020. *Id.* at 6. The relationship between Lindsey and Pearson soured and they decided to part ways. Doc. 7, Pls.' Mot., 11; Doc. 12, Defs.' Resp., 6.

Subsequently, Pearson and CyberX, through their attorney, delivered a letter on August 10, 2020 (the "August 10 Letter"), claiming sole ownership of any software developed during the existence of CXG and urging CXG to release AWIS and Coterie from their contracts with CXG. Doc. 8-17, Pls.' App., Ex. Q, 1, 3. The relevant portion of the August 10 Letter states:

> [CyberX and Pearson] anticipate that AWIS and Coterie will eventually decide to transition to a contract with [CyberX and Pearson] simply because they will eventually need assistance that [CXG and Lindsey] do not have the expertise to provide. We do not want to reach a deal with [AWIS and Coterie] only for a dispute to arise. . . . [Releasing AWIS and Coterie] will leave AWIS and Coterie free to immediately terminate their contracts with CyberX Group during the period if they wish, or to stay with [CXG] if they prefer.

*Id.* at 3.

In response, Lindsey and CXG commenced a lawsuit against Pearson and CyberX. *See generally* Doc. 1, Compl. They also filed a motion for a TRO on August 25, 2020, seeking, in essence, to prohibit Defendants from (1) disclosing CXG's trade secrets; (2) transferring or licensing CXG's intellectual property; (3) accessing or modifying CXG's software or other intellectual property; (4) soliciting CXG's clients; (5) directly competing with CXG; (6) entering or removing any personal property from CXG's offices; and (7) accessing CXG's bank account. Doc. 7, Pls.' Mot., 12–13.

On September 3, 2020, Defendants filed their response (Doc. 12) to Plaintiffs' motion for a TRO. On September 8, 2020, Plaintiffs filed a reply in support of their motion (Doc. 14), and the Court held a telephonic hearing for consideration of the TRO motion the same day. At the conclusion of the hearing, the Court denied Plaintiffs' motion for the reasons set forth below.

## II.

## LEGAL STANDARD

"Injunctive relief is an extraordinary and drastic remedy, and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (internal quotations and citation omitted). To obtain a TRO, a plaintiff must show: (1) "a substantial likelihood of success on the merits;" (2) "a substantial threat of immediate and irreparable harm, for which he has no adequate remedy at law;" (3) "that greater injury will result from denying

the [TRO] than from its being granted;" and (4) "that a [TRO] will not disserve the public interest." *Dearmore v. City of Garland*, 2005 WL 1630156, at *1 (N.D. Tex. June 28, 2005) (citing, *inter alia*, *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987)).

### III.

### ANALYSIS

A.  *Substantial Likelihood of Success on the Merits*

To demonstrate a likelihood of success on the merits, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *TFC Partners, Inc. v. Stratton Amenities, LLC*, 2019 WL 369152, at *2 (W.D. Tex. Jan. 30, 2019) (citation omitted). Plaintiffs premise their request for a TRO on three claims: (1) declaratory judgment that CXG owns all intellectual property relating to the software developed since Lindsey's initial business relationship with Pearson; (2) breach of contract; and (3) breach of fiduciary duty. Doc. 7, Pls.' Mot., 14–22. Based on the parties' briefing and the telephonic hearing, the Court concludes that Plaintiffs have not established a substantial likelihood of success on the merits, as explained below.[2] Thus, the Court **DENIES** Plaintiffs' motion for a TRO.

1.  Request for declaratory judgment

Plaintiffs request a declaratory judgment that "all intellectual property relating to the Healthcare Platform, including all copyrights, trade secrets, trademarks, documents, and works in progress are the sole property of CXG." Doc. 7, Pls.' Mot., 14. Plaintiffs contend that CXG's

---

[2] Because Plaintiffs have not demonstrated a likelihood of success on the merits, the Court does not analyze whether Plaintiffs show a substantial threat of immediate and irreparable harm, whether the balance of harms favors Plaintiffs, or whether a TRO will disserve the public interest.

ownership originates from Lindsey's ownership interest in CyberX and its software assets, as well as CXG's independent ownership of software developed after CXG's formation. *Id.* at 14–18. From the facts presented, however, Lindsey and CXG's ownership is not readily apparent.

        *a.*        *Lindsey's ownership in CyberX or its software*

First, Plaintiffs claim that Lindsey owns the intellectual property developed by CyberX because Pearson transferred a fifty-percent ownership interest in CyberX to Lindsey in exchange for Lindsey's financial support or, alternatively, because Lindsey owns fifty percent of the healthcare software developed since his relationship with CyberX commenced. *See id.* Plaintiffs' only support for Lindsey's purported ownership are the payments made by Lindsey's company, Agentra, to CyberX, as well as a January 9, 2017, email wherein Pearson states to Lindsey, "I am on board in terms of 50% in CyberX in exchange for a set agreement dependent upon the terms of the contract we make with CyberX & My Health Pass." *See id.* at 7, 16; Doc. 8-1, Pls.' App. Ex. A.

In response, Defendants assert that CyberX's relationship with Lindsey was not a partnership, but simply a service agreement wherein CyberX modified its software to fit Agentra's and MyHealthPass's needs, licensed software to the companies, and received monthly payments in return. Doc. 12, Defs.' Resp., 2–3. As evidence of this agreement, Defendants point to similar service contracts between CyberX and its other clients, as well as the monthly invoices issued by CyberX to Agentra and Lindsey. *Id.* Regarding the January 9, 2017, email, Defendants claim that Pearson's statement was merely made during negotiations for an "agreement that never came to fruition" and deny that any transfer of interest ever occurred. *Id.* at 12. Lastly, Defendants point to the March 22

Agreement that seemingly designates Pearson as the sole owner of CyberX. *Id.* at 4.[3] Absent additional evidence that demonstrates a voluntary transfer of ownership, the Court is satisfied with Defendant's explanation and does not find that Plaintiffs have shown a likelihood of establishing Lindsey's ownership of CyberX or its software.

### b. *CXG's software ownership*

Second, Plaintiffs claim that CXG owns the intellectual property of the healthcare software developed since CXG's formation. Doc. 7, Pls.' Mot., 18–19. Plaintiffs assert that any software developed by CXG employees, including Pearson, belongs to CXG as "works made for hire" under the Copyright Act of 1976. Doc. 14, Pls.' Reply, 4–6 (quoting 17 U.S.C. § 201(b)). Pursuant to the Copyright Act, an employer owns the copyright in "a work prepared by an employee within the scope of his or her employment[.]" 17 U.S.C. §§ 101, 201(b).

The parties dispute the nature of CXG's business. While Plaintiffs claim that CXG was created as "primarily a technology development company," Doc. 7, Pls.' Mot., 9, Defendants contend that CXG was created as a "middleman or agent for the sale of [CyberX] services to the insurance industry" and that CXG is engaged in *marketing, but not developing*, software. Defs.' Resp., 3–4 (emphasis added). In support of their claim that CXG is a development company, Plaintiffs point to Pearson's statement that CXG "create[s] custom software solutions" and an email to a programming team in India, where Pearson states, "[CXG] owns the software[.]" Doc. 14, Pls.' Reply, 1–2. Plaintiffs' evidence does not demonstrate a substantial likelihood that CXG is a technology development company rather than a marketing company for CyberX. First, Pearson's statement that

---

[3] Plaintiffs do not address the significance of the March 22 Agreement in their briefing. *See generally* Doc. 7, Pls.' Mot.; Doc. 14, Pls.' Reply. At the hearing, Plaintiffs could not state whether the March 22 Agreement was a binding contract or something else entirely.

CXG "create[s] custom software solutions" is ambiguous and could be interpreted multiple ways. A "software solution" could be actual software development, but could also be a service connecting clients with software providers. Second, Pearson's email to the India programming team does not provide context for his statement and does not indicate to which "software" it refers. The email's purpose could simply have been to inform its recipients that the India programming team would not own the software it was helping to develop. If CXG is purely a marketing company, then software development is not within the scope of CXG employment and CXG cannot claim copyright ownership over the software as a work made for hire.

Based on the evidence at hand, Plaintiffs are unlikely to prevail in their request for declaratory judgment. Plaintiffs have not sufficiently shown that any voluntary transfer of ownership ever occurred or that CXG was a software development company rather than a software marketing company. This claim, therefore, may not serve as the basis for a TRO.

2.  Breach of contract

In support of their motion for a TRO, Plaintiffs assert that they are likely to succeed on their breach-of-contract claim, specifically alleging breaches of Sections 3.6(B) and 4.12 of the Company Agreement. *See* Doc. 7, Pls.' Mot., 19–21. A breach-of-contract claim has four elements: (1) "the existence of a valid contract"; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) "damages sustained as a result of the breach." *Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 731 (5th Cir. 2018). Neither party disputes the validity of the Company Agreement or the sufficiency of Lindsey's performance under it. *See generally* Doc. 7, Pls.' Mot.; Doc. 12, Defs.' Resp. However, Plaintiffs fail to demonstrate that Defendants have breached the Company Agreement.

First, Plaintiffs claim that Pearson violated the confidentiality provision, Section 3.6(B), which prohibits any member from disclosing "any information that it receives concerning [CXG] that is identified as being confidential (and if that information is provided in writing, that is so marked)[.]" Doc. 8-7, Pls.' App., Ex. G, 9. Plaintiffs claim that "[b]y asserting dominion over, among other things, CXG's trade secret assets, it is clear that [Defendants] intend to disclose or license those secrets to third parties[.]" Doc. 7, Pls.' Mot., 21. Plaintiffs do not, however, indicate which trade secrets, aside from intellectual property in the software—over which Plaintiffs have not established ownership—are at risk of wrongful disclosure. Moreover, Plaintiffs do not allege that any at-risk trade secrets were identified as being confidential as required by Section 3.6(B). At the hearing, Plaintiffs pointed to a boilerplate "Confidentiality Notice" found at the end of CXG emails, which states that the email message and attachments "may contain confidential and privileged information." Doc. 15-5, Pls.' Reply App., Ex. X, 1–13. This evidence does little to bolster Plaintiff's claim that Pearson breached Section 3.6(B), as Plaintiffs have not shown that Pearson disclosed these emails or their attachments to a third party. Accordingly, Plaintiffs have not demonstrated a substantial likelihood of success on their claim for breach of Section 3.6(B).

Second, Plaintiffs claim that Pearson violated Section 4.12, which prohibits members from engaging in other business ventures in competition with CXG. Doc. 8-7, Pls.' App., Ex. G, 11–12. As the sole evidence of Pearson's breach, Plaintiffs point to the August 10 Letter from Defendants' attorney, interpreting the letter as "Pearson's stated intention to co-opt CXG's current clients[.]" Doc. 7, Pls.' Mot., 23. This intent is not apparent from the letter itself. *See* Doc. 8-17, Pls.' App., Ex. Q, 3. To the contrary, the letter expressly states that Defendants wish to avoid conducting business with AWIS and Coterie in a way that would lead to a dispute with CXG. *Id.* At the hearing,

Defendants explained that this letter was intended to advise CXG to release AWIS and Coterie from their contracts because, from Defendants perspective, CXG could not meet its clients' needs without Pearson and CyberX. Plaintiffs do not provide any other evidence of Defendants' intent to solicit CXG's clients. Accordingly, Plaintiffs have not demonstrated a breach of Section 4.12. Plaintiffs, thus, are unlikely to succeed on their claim for breach of contract.

        3.        Breach of fiduciary duty

Finally, Plaintiffs claim that Pearson breached his fiduciary duty to CXG. Doc. 7, Pls.' Mot., 21–22. "Under Texas law, a formal fiduciary relationship exists between a principal and its agent." *Clarke-Smith v. Bus. Partners in Healthcare, LLC*, 2016 WL 279094, at *11 (N.D. Tex. Jan. 22, 2016) (citing *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)). "When a fiduciary relationship exists, the employee has a duty to act primarily for the benefit of the employer, not to compete against the employer in matters connected with her employment, and to deal fairly with the employer in all transactions between them." *Id.* (citing *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 509 (Tex. App. — Houston [14th Dist.] 2003, no pet.). Plaintiffs claim that Pearson served as CXG's president and that, as president, he owed CXG a fiduciary duty that he ultimately breached because "he has not dealt fairly with the company, has competed with the company in its primary business, and has misappropriated company assets." Doc. 7, Pls.' Mot., 22. While Plaintiffs may have demonstrated the existence of a fiduciary duty, they offer little evidence to show that Pearson breached his duty.

Plaintiffs do not allege any unfair dealings other than Pearson's alleged wrongful competition with CXG and misappropriation of CXG assets. *See id.* As evidence for his wrongful competition with CXG, Plaintiffs again point to the August 10 Letter. *See id.* As previously discussed, this letter does

not sufficiently demonstrate that Pearson competed with, or intends to compete with, CXG. Additionally, Plaintiffs have not successfully demonstrated that Pearson misappropriated CXG's assets. The allegedly misappropriated assets are the intellectual property in the software as well as payments made from CXG to CyberX, which Defendants claim were agreed-upon service fees. *Id.* at 21–22; Doc. 12, Defs.' Resp., 13. As discussed, Plaintiffs have not sufficiently demonstrated that CXG owns the software and, therefore, Pearson's use cannot be considered misappropriation. Further, as discussed, Plaintiffs have not shown that CXG was a development company rather than a marketing company that paid CyberX a fee to sell CyberX's software. If CXG is a marketing company, then the service payments to CyberX would not have been misappropriated. Plaintiffs, therefore, cannot sufficiently demonstrate that Pearson has misappropriated any of CXG's assets, competed with CXG, or otherwise breached his fiduciary duty.

In sum, Lindsey and CXG have not established a likelihood of success on the merits of any claim. First, there is insufficient evidence to succeed on Plaintiffs' claim of ownership in the intellectual property related to the software at issue. Second, Plaintiffs fail to demonstrate that Pearson breached the Company Agreement and thus cannot likely succeed on their breach-of-contract claim. Lastly, Plaintiffs have not demonstrated that they are likely to succeed on their claim for breach of fiduciary duty.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Lindsey and CXG's motion for a TRO (Doc. 7).

SO ORDERED.

SIGNED: September 10, 2020.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE