UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CYBERX GROUP, LLC and DAVID E. LINDSEY, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:20-CV-2501-B |
| CHRISTOPHER PEARSON, CYBERX, LLC, TROY VAN ZILE, PEARSON HOLDINGS, INC., OPERATION 29, LLC, LANDON JORDAN, GRAFORD BUSINESS MANAGEMENT, LLC, and VZLIVIN, LLC, | § § § § § § § § | |
| Defendants. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Plaintiffs CyberX Group, LLC and David E. Lindsey's Second Motion for Preliminary Injunction (Doc. 48) ("the Second Motion"). The Court denied Plaintiffs' previous request for injunctive relief by order dated September 11, 2020 (Doc. 18). Plaintiffs filed the Second Motion on January 20, 2021. After considering the parties' briefing and holding a hearing on the Second Motion on March 4, 2021, the Court **GRANTED** Plaintiffs' motion and **PRELIMINARILY ENJOINED** Defendants from:

> (1) within the insurance services field, either directly or indirectly, selling, marketing, licensing, or purporting to license any CRM software, CRM software as a service, or CRM software development services that includes any software that was developed by, with the assistance of, or under the supervision of Christopher Pearson and/or Troy Van Zile from January 9, 2017 through present; and
>
> (2) either directly or indirectly, selling, marketing, licensing, or purporting to license any software or software as a service that was derived from the SmartE software.

Doc. 48-1, Pls.' Proposed Order, 1–2; *see* Doc. 66, Tr., 95:23–96:19. This Order further explains the Court's reasoning.

## I.

## BACKGROUND

*A.    Initial Facts*

On July 10, 2018, Plaintiff David Lindsey, Defendant Christopher Pearson, and Defendant Troy Van Zile executed a Company Agreement and formed CyberX Group LLC ("CXG"). *See* Doc. 49-2, Pls.' Mot. App., 4–39. The exact nature of CXG's business is unclear, as the parties dispute whether CXG is involved in the development of customer-relationship management ("CRM") software. *See* Doc. 48, Pls.' Mot., 2 (stating that CXG "was established for the express purpose of building a software platform, including significant [CRM] features"); Doc. 54, Defs.' Resp., 3 (stating that CXG "market[s] the platform to others" and operates as a "middleman"). All agree, however, that CXG's business includes marketing CRM software to the healthcare-insurance industry. *See* Doc. 48, Pls.' Mot., 2–3; Doc. 54, Defs.' Resp., 3. Lindsey, Pearson, and Van Zile were the only members of CXG; Lindsey held a seventy-percent interest, Pearson held a twenty-percent interest, and Van Zile held a ten-percent interest in CXG. Doc. 49-2, Pls.' Mot. App., 39. Additionally, Pearson served as CXG's President, and Van Zile served as its Chief Operating Officer (COO). Doc. 49-3, Pls.' Mot. App., 41–42. Lindsey provided funding for CXG, investing over $1,000,000 into the company. Doc. 48, Pls.' Mot., 3 (citing Doc. 49-9, Pls.' Mot. App., 73–89; Doc. 49-42, Pls.' Mot. App., 284). In relevant part, section 4.12 of the CXG Company Agreement provides:

> **Conflicts of Interest** . . . [E]ach Manager, Member and officer of [CXG] at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, save and except

for ones in competition with [CXG], with no obligation to offer to [CXG] or any other Member, Manager, or officer the right to participate therein.

Doc. 49-2, Pls.' Mot. App., 19.

After the development of an initial healthcare-insurance CRM software, CXG successfully marketed it and executed two contracts to provide the software to American Workers Insurance Services, Inc. ("AWIS") and Coterie Advisory Group, Inc. ("Coterie"). Doc. 49-11, Pls.' Mot. App. 109; Doc. 49-12, Pls.' Mot. App., 131. Based on these successful contracts, Lindsey, Pearson, and Van Zile planned for development of a second version of the software, which would be called SmartE.[1] SmartE was initially scheduled to launch on January 1, 2020, Doc. 49-15, Pls.' Mot. App., 155, and "CXG began an advertising plan that included promoting the 'SmartE' brand to the interested market" through a website, Lindsey's network, and CXG's existing customers. Doc. 48, Pls.' Mot., 4 (citing Doc. 49-42, Pls.' Mot. App., 285). However, Pearson and Van Zile repeatedly missed deadlines and delayed delivery of SmartE. Doc. 49-17, Pls.' Mot. App., 169 (noting an "April 15 demo date"); Doc. 49-18, Pls.' Mot. App., 173 (noting a "July 1st launch"), 172 (Van Zile stating in a message dated Friday, July 10, 2020, that "Wednesday[, July 15, 2020,] should work" for a SmartE demonstration). SmartE was never delivered. Doc. 49-42, Pls.' Mot. App., 285.

Instead, on August 10, 2020, Pearson and Van Zile, through their attorney, delivered to Lindsey a letter ("the August Letter") claiming sole ownership of any software developed during the existence of CXG. Doc. 49-28, Pls.' Mot. App., 223–24. The August Letter urged CXG to release AWIS and Coterie from their contracts with CXG, stating that "AWIS and Coterie will eventually

---

[1] It is unclear from the evidence whether SmartE was to be developed and owned by CXG, or whether it was to be developed and owned by Pearson's other software company, Defendant CyberX, LLC ("CyberX"), and licensed to CXG for marketing purposes.

decide to transition to a contract with" Pearson and Van Zile. *Id.* at 225. Further, it stated that CXG "isn't worth anything" and sought "a complete formal separation between" Pearson, Van Zile, and Lindsey. *Id.* Accordingly, the August Letter stated that Pearson and Van Zile would "resign from all positions" and purported to "transfer . . . their ownership interests in" CXG. *Id.*

B.     *Plaintiffs' Previous Motion for a TRO*

In response to the August Letter, Lindsey and CXG commenced a lawsuit against Pearson and CyberX, seeking a temporary restraining order ("TRO") and preliminary injunction that, among other things, would prohibit them from soliciting CXG's clients and competing with CXG. Doc. 7, Pls.' TRO Mot., 13. Plaintiffs based their request for injunctive relief on their claims for: (1) declaratory judgment that CXG owned all intellectual property in the software developed during its existence; (2) breach of the Company Agreement—namely, § 4.12 (conflicts-of-interests provision) and § 3.6(B) (confidentiality provision); and (3) Pearson's breach of fiduciary duty to CXG. *Id.* at 13–22.

After holding a hearing on September 8, 2020, the Court denied Plaintiffs' request for TRO or preliminary injunction, finding that the evidence was insufficient to show a likelihood of success on CXG's claims that CXG owned the intellectual property or that Pearson had competed with CXG. The Court explained its reasoning in an order dated September 11, 2020 (Doc. 18).

C.     *Newly Discovered Facts*[2]

Plaintiffs base the Second Motion for a preliminary injunction on the discovery of "*shocking new facts and circumstances that were previously unknown, and indeed, obscured by Defendants.*"

---

[2] These facts are derived from the parties' briefing on the Second Motion.

Doc. 48, Pls.' Mot., 1 (emphasis in original). The newly discovered facts pertinent to this Order are as follows.

Messages dated as early as August 12, 2019, show that Pearson, Van Zile, and Landon Jordan—the owner and president of AWIS—planned to create a business with a "similar set-up" to CXG, but "with different funding support[.]" Doc. 49-19, Pls.' Mot. App., 177, 182. And as Plaintiffs' new evidence demonstrates, that plan came to fruition. Indeed, Operation 29, LLC ("Op29") was formed on February 5, 2020. Doc. 49-24, Pls.' Mot. App., 206; Doc. 48, Pls.' Mot., 1. Op29's sole members are Pearson Holdings, Inc. ("PHI"), Graford Business Management, LLC ("GBM"), and VZLivin, LLC ("VZL"). Doc. 49-24, Pls.' Mot. App., 206. Plaintiffs argue that PHI, GMB, and VZL are "shell companies" owned by Pearson, Jordan, and Van Zile, respectively. Doc. 48, Pls.' Mot., 1. According to Plaintiffs, the shell companies were used as a means of concealing Pearson, Van Zile, and Jordan's involvement in Op29 from Lindsey so that they could "extend time without any . . . major changes" at CXG while they worked to establish Op29 as a competitor in the healthcare-insurance software industry. Doc. 49-19, Pls.' Mot. App., 182; Doc. 48, Pls.' Mot., 5–6.

Forensic analyses of CXG's servers revealed that Op29 was providing CRM services to clients within the healthcare-insurance industry as early as March 2020. Indeed, Plaintiffs discovered a website—memberportalaccess.com—built using CXG's servers and stating on its homepage that the site is "powered by Op29[.]" *See* Doc. 57-1, Pls.' Reply App., 290. Certain files associated with that website "were last modified on March 23, 2020." Doc. 57-4, Pls.' Reply App., 301–02. Plaintiffs believe that Op29 built this website for AWIS's "sister company," Association Health Care Management, Inc. ("AHCM"), as evidenced by AHCM's operating report filed in bankruptcy proceedings. Doc. 48, Pls.' Mot., 19. The operating report shows that AHCM owes a past-due

balance of $41,129 and a current balance of $91,126 to Op29 for "[s]ystems fees." Doc. 49-31, Pls.'

Mot. App., 234. Jordan owns AHCM as well as AWIS. Doc. 49-36, Pls.' Mot. App., 245.

Additionally, Brian Duly, the owner of Premier Health Solutions, LLC ("Premier")—a

company that "provides customers with insurance management services"—stated that he "received

a communication from [Jordan] regarding a platform project[.]"[3] Doc. 57-5, Pls.' Reply App., 305.

And on August 20, 2020—ten days after the August Letter was sent—Mr. Duly "received a

voicemail from Troy Van Zile" that "included an invitation to a [w]ebinar [d]emonstration related

to Op29." *Id.* at 306. He received a similar voicemail from Van Zile on October 12, 2020, regarding

another Op29 webinar. *Id.* Although Mr. Duly believed that Jordan was involved in "a project that

also involved Mr. David Lindsey," *id.* at 305, Plaintiffs deny that Lindsey was aware of the webinar

or of Op29's existence at that time. Doc. 66, Tr., 82:20–83:9.

Finally, Plaintiffs provide screenshots of Op29's website, operation29.com, which Plaintiffs

claim advertises "a comprehensive solution for insurance organizations[.]" *See* Doc. 48, Pls.' Mot.,

6. As Plaintiffs point out, the CRM platform advertised on Op29's website looks strikingly similar,

if not "nearly identical," to the design for SmartE. *See id.* at 6–7. Additionally, "Op29's website also

advertises the same features, sometimes in identical language to SmartE's website[.]" *Id.* at 7–8.

Although SmartE was never delivered in operable condition to CXG, it appears that Op29 has a fully

operational platform. *See id.*

---

[3] Mr. Duly stated that Jordan "referred to" the platform "as Cyber X[.]" Doc. 57-5, Pls.' Reply App., 305. However, as Defendants point out, "it would probably be pretty easy for anyone to confuse CyberX and CyberX Group [(CXG)] . . . So it wouldn't be surprising that Mr. Duly did the same." Doc. 66, Tr., 83:21–84:1. In any event, the most important takeaway is that Jordan made contact with Mr. Duly—a potential CXG customer—without Lindsey's involvement.

D.    *Plaintiffs' Amended Complaint and Second Motion for Preliminary Injunction*

Upon discovery of this new information, Plaintiffs filed a second amended complaint on October 8, 2020, and added Op29, Van Zile, Jordan, GBM, VZL, and PHI as defendants. *See generally* Doc. 38, Am. Compl. The amended complaint requests declaratory judgment and asserts claims against the various Defendants, including breach of contract, breach of fiduciary duty, violation of the Defend Trade Secrets Act, violation of the Texas Uniform Trade Secrets Act, tortious interference, breach of Idaho Limited Liability Company Act, common law fraud, and civil conspiracy. *Id.* at 19–28. Additionally, on January 20, 2021, Plaintiffs filed the Second Motion (Doc. 48), which sought the preliminary injunction described in this Order. On March 4, 2021, once the Second Motion was fully briefed, the Court held a hearing on it. After hearing the parties' arguments and reviewing the briefing, the Court granted the Second Motion and issued the preliminary injunction.

## II.

## LEGAL STANDARD

"Injunctive relief is an extraordinary and drastic remedy, and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (quotation marks and citation omitted). To obtain a preliminary injunction, a plaintiff must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable injury absent the injunction; (3) that the threatened injury outweighs any harm the injunction might cause the defendants; and (4) that the injunction will not impair the public interest." *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 442 (5th Cir. 2000) (citation omitted).

"When crafting an injunction, district courts are guided by the Supreme Court's instruction that 'the scope of injunctive relief is dictated by the extent of the violation established.'" *ODonnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). However, when a court finds injunctive relief proper, it may bind the parties as well as "the parties' officers, agents, servants, employees, . . . attorneys," and "other persons who are in active concert or participation with" any of the previously listed persons. Fed. R. Civ. P. 65(d)(2); *see also Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir. 1985) ("An injunction binds not only the parties subject thereto, but also nonparties who act with the enjoined party." (citations omitted)).

## III.

## ANALYSIS

Plaintiffs premise their request for a preliminary injunction on their claims for breach of contract, breach of fiduciary duty, tortious interference, and conspiracy to breach fiduciary duties. Doc. 48, Pls.' Mot., 10–11. At the hearing, the Court found that Plaintiffs successfully demonstrated all of the elements required to obtain a preliminary injunction, particularly as they relate to Plaintiffs' breach-of-contract and breach-of-fiduciary duty claims. Accordingly, the Court granted the Second Motion and issued the preliminary injunction.

A.   *Plaintiffs Demonstrated Likelihood of Success on the Merits.*

To demonstrate a likelihood of success on the merits, "the plaintiff must present a *prima facie* case, but need not prove that he is entitled to summary judgment." *TFC Partners, Inc. v. Stratton Amenities, LLC*, 2019 WL 369152, at *2 (W.D. Tex. Jan. 30, 2019) (italics added and citation omitted); *see Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011). "To assess the likelihood of success on the merits, [courts] look to 'standards provided by the substantive law.'" *Alguire*, 647 F.3d

at 596 (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990) (citation omitted)). Based on the parties' briefing and the evidence produced at the hearing, the Court concluded that Plaintiffs have established a substantial likelihood of success on the merits on their claims for breach of contract and breach of fiduciary duty. This holding is further explained below.

1.     Breach of contract

Plaintiffs are likely to succeed on their breach-of-contract claims. Plaintiffs claim that Pearson and Van Zile breached § 4.12 of the Company Agreement by competing with CXG through their involvement with Op29. Doc. 48, Pls.' Mot., 11. Under Texas law, the elements of a breach-of-contract claim are: (1) "the existence of a valid contract," (2) "performance or tendered performance by the plaintiff," (3) "breach by the defendant," and (4) "damages sustained as a result[.]" *Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 731 (5th Cir. 2018). Defendants do not dispute that Lindsey performed under the Company Agreement or that Lindsey was damaged by the alleged breach. *See generally* Doc. 54, Defs.' Resp. Thus, the inquiry turns on whether § 4.12 is a valid contract provision and whether Pearson and Van Zile breached it. Plaintiffs have established a substantial likelihood that both questions are answered in the affirmative.

i.     *Section 4.12 is a valid contract provision.*

Defendants claim that § 4.12 is an unenforceable covenant not to compete "because it is not reasonable in time, scope, or geography and imposes greater restraint than is necessary to protect a business interest of CXG." Doc. 54, Defs.' Resp., 10. However, the Court agrees with Plaintiffs that § 4.12 is not an unenforceable covenant not to compete, but instead is "a limited, and more specific, contractual duty of loyalty imposed among members of the company, which [is] enforceable, and indeed presumed in some business relationships." Doc. 56, Pls.' Reply, 4 (citations omitted). Indeed,

"[t]he company agreement of a limited liability company may expand or restrict any duties, including fiduciary duties, and related liabilities that a member, manager, officer, or other person has to the company or to a member or manager of the company." Tex. Bus. Orgs. Code § 101.401.

Under Texas law, "corporate officers . . . owe fiduciary duties to the corporations they serve and must not allow their personal interests to prevail over the interests of the corporation." *In re Harwood*, 637 F.3d, 615, 620 (5th Cir. 2011) (citations omitted). And while "[t]he Texas Business Organization[s] Code is silent as to an LLC member's fiduciary duties, . . . [t]he cases support finding that [members] owe[] [the LLC] fiduciary duties based on agency-law principles." *Katz v. Intel Pharma, LLC*, 2020 WL 3871493, at *2 (S.D. Tex. July 9, 2020) (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002); *In re Hardee*, 2013 WL 1084494, at *3–4 (Bankr. E.D. Tex. Mar. 14, 2013)). In other words, members are agents of their LLCs, and fiduciary duties arise where an agency relationships exist. *See Johnson*, 73 S.W.3d at 200. And though the August Letter purported to transfer Pearson and Van Zile's ownership interests, *see* Doc. 49-28, Pls.' Mot. App., 223–24, this does not relieve them of the fiduciary duties owed as members of CXG. Indeed, Texas law does not permit "[a] member of a limited liability company [to] withdraw" unless he "is permitted to do so by contract[.]" *Kennebrew v. Harris*, 425 S.W.3d 588, 598 n.2 (Tex. App.—Houston [14th Dist.], pet. denied) (citing Tex. Bus. Orgs. Code Ann. §§ 101.107, 101.205). And the Company Agreement explicitly prohibits withdrawal, as § 3.8 provides that "[n]o [m]ember has the right to withdraw from [CXG] as a member." Doc. 49-2, Pls.' Mot. App., 17. Therefore, Pearson and Van Zile owed fiduciary duties to CXG in their roles as both officers and members of the LLC.

Among their fiduciary duties are the obligations "not to act as, or on account of, an adverse

party without the [LLC's] consent, . . . not to compete with the [LLC] on his own account or for another[,] and . . . to deal fairly with the [LLC.]" *Johnson*, 73 S.W.3d at 200. Section 101.401 of the Texas Business Organizations Code permits a company agreement to "expand or restrict" these duties. Section 4.12 of the Company Agreement provides that "each [m]anager, [m]ember and officer of [CXG] . . . may engage in and possess interests in other business ventures . . . , save and except for ones in competition with [CXG.] Doc. 49-2, Pls.' Mot. App., 19. In other words, § 4.12 imposes the fiduciary duty to refrain from competing with CXG. *See Lifshutz v. Lifshutz*, 199 S.W.3d 9, 18 (Tex. App.—San Antonio 2006, pet. denied) (citation omitted). Under Texas law, such a provision is not an unenforceable covenant not to compete but is rather an imposition of a fiduciary duty to the members, managers, and officers of CXG. *See, e.g.*, *Strebel v. Wimberly*, 371 S.W.3d 267, 278 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (provision of a company agreement valid where it imposed the "duties of due care, good faith, and loyalty" on the company's managers).

Finally, even if § 4.12 were construed as a non-compete agreement "contain[ing] limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable[,]" the proper remedy would be to "reform the covenant to the extent necessary to cause the limitations . . . to be reasonable[.]" Tex. Bus. & Com. Code § 15.51(c); *see Orthoflex, Inc. v. Thermotek, Inc.*, 2011 WL 5879330, at *1 (N.D. Tex. Nov. 23, 2011) ("Under Texas law, when a court determines that a noncompete covenant is unenforceable as written, the court is required to reform it to the extent necessary to be reasonable."). Because § 4.12 is not an impermissible non-compete agreement, the Court need not reform its limitations. However, it is worth noting that Pearson and Van Zile operated Op29 during the time they acted as members and officers of CXG, in the same area and scope of activity as CXG. Were the Court to reform § 4.12 and impose reasonable limits as to time,

area, and scope of activity, it is likely that Pearson and Van Zile's activities would nonetheless fall within such limits. Thus, the Court finds that § 4.12 of the Company Agreement is valid and enforceable.

> ii.    *Lindsey tendered performance.*

Plaintiffs have demonstrated Lindsey's performance under the Company Agreement, given that Lindsey "provid[ed] his $700 initial capital contribution as stated in Section 8.1 of the agreement and Exhibit A to the agreement." Doc. 48, Pls.' Mot., 11 (citing Doc. 49-2, Pls.' Mot. App., 28, 39). Defendants do not dispute Lindsey's performance. *See generally* Doc. 54, Defs.' Resp. Thus, Plaintiffs have satisfied this element.

> iii.    *Pearson and Van Zile breached § 4.12.*

Section 4.12 prohibits CXG's members from "engag[ing] in and possess[ing] interests in other business ventures . . . in competition with [CXG.]" Doc. 49-2, Pls.' Mot. App., 19. Defendants claim that Pearson and Van Zile did not breach § 4.12 because Op29 was not "in competition" with CXG while Pearson and Van Zile were officers at CXG. Doc. 54, Defs.' Resp., 6–7. The Court disagrees, finding that Op29 was in competition with CXG and that Pearson and Van Zile thus breached § 4.12.

To summarize, Defendants argue that Op29 is not in competition with CXG because CXG is "not . . . able to offer services to customers until it releases new software in 2022." *Id.* at 9. However, any current inability to offer services on CXG's part is primarily due to Pearson's and Van Zile's breaches. Therefore, as Plaintiffs point out, Defendants' argument is essentially "that Pearson and Van Zile have been so successful in breaching Section 4.12, that CXG does not have the wherewithal to compete with Op29." Doc. 56, Pls.' Reply, 4. The Court finds Defendants' argument

unavailing.

SmartE was initially set to launch on January 1, 2020. Doc. 49-14, Pls.' Mot. App., 155. But Pearson and Van Zile repeatedly delayed its delivery, Doc. 49-17, Pls.' Mot. App., 169; Doc. 49-18, Pls.' Mot. App., 172–73, ultimately leaving CXG with an incomplete and inoperable SmartE platform by the time they officially resigned on August 10, 2020. *See* Doc. 66, Tr., 57:4–11. As evidenced by their messages and Op29's activities during that time, the delay and ultimate failure to deliver SmartE was an intentional attempt to "[e]xtend time without any . . . major changes" at CXG while Pearson and Van Zile worked to develop Op29's platform, solicit potential clients, and perform services for clients using CXG's servers. Doc. 49-19, Pls.' Mot. App., 182; *see* Doc. 57-1, Pls.' Reply App., 290. It is unsurprising that Pearson and Van Zile's breaches left CXG in a position where it could not immediately offer services to customers, and the Court rejects the argument that CXG is not in competition with Op29 simply because Pearson and Van Zile's acts placed CXG at a "competitive disadvantage." Doc. 66, Tr., 58:2.

Regardless, the evidence demonstrates that Op29 was indeed in competition with CXG while Pearson and Van Zile were members and officers of CXG, and until the time that the Court issued the injunction. For example, forensic analysis of CXG's servers revealed a website—memberportalaccess.com—built using CXG's servers. *See* Doc. 57-1, Pls.' Reply App., 290. The homepage of this website states that the site is "powered by Op29[.]" *Id.* And the files associated with that website "were last modified on March 23, 2020." Doc. 57-4, Pls.' Reply App., 301–02. Regardless of whether Op29 built this website for AHCM, as Plaintiffs believe, the website's existence serves as evidence that Op29 provided services for *some* potential customer of CXG. And if memberportalaccess.com was not built for AHCM, it appears that Op29 rendered additional

services to AHCM, in competition with CXG, to result in AHCM's debt to Op29 for "[s]ystems fees." *See* Doc. 48, Pls.' Mot., 19; *see also* Doc. 49-31, Pls.' Mot. App., 234.

Additionally, the evidence of Jordan and Van Zile's communications with Mr. Duly and the surrounding circumstances reveal that Jordan and Van Zile were making efforts to secure Premier's business on behalf of Op29. Mr. Duly "received a communication from Mr. Landon Jordan regarding a platform project[.]" Doc. 57-5, Pls.' Reply App., 305. And on August 20, 2020, Mr. Duly "received a voicemail from Troy Van Zile" that "included an invitation to a [w]ebinar [d]emonstration related to Op29." *Id.* at 306. While Defendants argue that this meeting may have been to pitch CXG's products and that "[t]here's no evidence . . . that the meeting involved Mr. Jordan pitching software to sell or market software to Mr. Duly," the Court finds this argument unavailing. Doc. 66, Tr., 83:15–18. As Plaintiffs point out, "Jordan had nothing to do with [CXG] and its platform," as he was only a client of CXG. *Id.* at 82:14–16 Thus, Jordan "could not have pitched a meeting to Mr. Duly about [CXG], because he was unaffiliated at the time." *Id.* at 82:16–18.

While they protest Plaintiffs' allegations of what occurred at the meeting, Defendants offer no other plausible narrative for the Court to consider.[4] They only speculate that "[i]t could have just been [Jordan] was happy with [CXG's] product, . . . and he said, [h]ey, person I know, why don't I show this to you so you can get in on this great thing, too." *Id.* at 84:7–11. In other words, Defendants would have the Court believe that Jordan was pitching CXG's software to a potential Op29 client simply because he was pleased with it, even though Jordan had no stake in CXG, and

---

[4] Mr. Duly's declaration did not elaborate on the details of these communications and meetings, as Van Zile presented Mr. Duly with a non-disclosure agreement, which Mr. Duly "did execute . . . and therefore [is] unwilling and unable to share anything related to the webinar or the substantive communications related thereto." Doc. 57-5, Pls.' Reply App., 306.

even though he had co-founded a competing company just eight months prior. They urge the Court to adopt this suggestion as truth simply because Plaintiffs "don't have evidence that that wasn't what was happening[.]" *Id.* at 84:12–13. The Court does not accept Defendants' suggestion, as it is illogical and seriously lacking in credibility. Rather, the Court agrees with Plaintiffs that "the only logical conclusion," considering the evidence and surrounding circumstances, is that Jordan and Van Zile were soliciting Premier's business on behalf of Op29. *Id.* at 84:21.

As Defendants highlight, the Texas Supreme Court defines "competition" as "the struggle for commercial advantage; the effort or action of two or more commercial interests to obtain the same business from third parties." *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 701 (Tex. 2015) (citation omitted and alteration incorporated). Premier was a potential customer for CXG's business, as Mr. Duly believed the project "involved Mr. David Lindsey." Doc. 57-5, Pls.' Reply App., 305. And on February 25, 2021, CXG employees "met with [Premier] to be a potential client of [CXG's] platform. But, more importantly, to be a contact resource for additional clients." Doc. 66, Tr., 57:17–25. The Court accepts this evidence as suggesting that CXG and Op29 are making efforts "to obtain the same business from third parties" and that Op29 and CXG are in competition. *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d at 701.

Therefore, the evidence reveals that Pearson and Van Zile, on behalf of Op29, were competing with CXG while they were officers and members of CXG, in violation of § 4.12 of the Company Agreement. While Pearson and Van Zile resigned from their respective positions as officers on August 10, 2020, *see* Doc. 49-28, Pls.' Mot. App., 225; *see also* Doc. 54, Defs.' Resp., 20, they remained subject to fiduciary duties to CXG as members. *See Katz*, 2020 WL 3871493, at *2. Regardless, the evidence shows that Op29 was competing as early as March 2020, while Pearson and

-15-

Van Zile were both officers and members. Doc. 57-4, Pls.' Reply App., 301–02.

        *iv.*    *Plaintiffs suffered damages.*

Finally, Plaintiffs have shown a substantial likelihood of damages suffered from these breaches, as explained below in the Court's discussion of the substantial threat of irreparable injury. *See infra* Section III.B.

In sum, § 4.12 is a valid contractual provision prohibiting CXG's members, including Pearson and Van Zile, from "engag[ing] in and possess[ing] interests in other business ventures . . . in competition with [CXG.]" Doc. 49-2, Pls.' Mot. App., 19. The Court finds no evidence that Lindsey failed to perform under the Company Agreement but finds convincing evidence that Pearson and Van Zile breached § 4.12 by competing with CXG. And as will be discussed, Pearson and Van Zile's breaches damaged Plaintiffs. Accordingly, Plaintiffs have shown a likelihood of success on their breach-of-contract claims.

    2.    <u>Breach of fiduciary duty</u>

Plaintiffs also base their request for a preliminary injunction on their claims against Pearson and Van Zile for breaching their fiduciary duties to CXG. Doc. 48, Pls.' Mot., 13. The elements of a breach-of-fiduciary-duty claim are: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)). Plaintiffs are likely to succeed on these claims.

        *i.*    *Pearson and Van Zile owed fiduciary duties.*

As discussed, Pearson and Van Zile owed fiduciary duties to CXG in their capacities as

officers and members. *See supra* Section III.A.1.i. Among these fiduciary duties are the obligations "not to act as, or on account of, an adverse party without the [LLC's] consent, . . . not to compete with the [LLC] on his own account or for another[,] and . . . to deal fairly with the [LLC.]" *Johnson*, 73 S.W.3d at 200.

The Court rejects Defendants' argument that "[t]here is no evidence that Van Zyle [sic] was actually employed by [CXG]." Doc. 54, Defs.' Resp., 16. The evidence shows that even if Van Zile was not a CXG "employee" by Defendants' standards, he served as CXG's COO and thus owed fiduciary duties to the company as an officer. *See* Doc. 49-3, Pls.' Mot. App., 42. Moreover, as discussed, Pearson and Van Zile owed fiduciary duties to CXG as members. *See Katz*, 2020 WL 3871493, at *2. Thus, the first element is satisfied.

      ii.    *Pearson and Van Zile breached their fiduciary duties.*

Plaintiffs allege that Pearson and Van Zile breached their fiduciary duties to CXG by competing with it and by failing to deal fairly with CXG. Doc. 48, Pls.' Mot., 8, 15. Defendants argue that Plaintiffs have not shown a likelihood of success on their breach-of-fiduciary-duty claims because (1) "an agent's mere preparation to compete is not a breach of fiduciary duty under the law," and (2) "the other allegations of breaches alleged by the Plaintiffs are not supported by the evidence and do not establish a breach of fiduciary duty." Doc. 54, Defs.' Resp., 14–15. The Court rejects both arguments.

First, Defendants argue that Pearson and Van Zile did not breach their fiduciary duties to CXG because "[i]t is not a breach of fiduciary duty for agents of a company to plan to compete with it while still working for the company." *Id.* at 15 (emphasis omitted). Defendants cite *Abetter Trucking Company v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.),

and *Rimkus Consulting Group., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 651 (S.D. Tex. 2010), in support of this contention. *Abetter* involved a breach-of-fiduciary-duty claim by a trucking company against a former at-will employee who left to start his own trucking company. 113 S.W.3d at 507. The court found that the defendant–employee did not breach his fiduciary duty to his employer where he informed the employer that "he planned to form his own company and would be taking seven trucks belonging to him and his brothers[,]" but failed to disclose "that he had incorporated his company . . . , obtained permits, . . . obtained insurance . . . [and] . . . that a number of the [employer]'s drivers had expressed their intent to drive for [the defendant's] company." *Id.* at 511. Similarly, in *Rimkus*, the defendant–employees did not breach their fiduciary duties to their employer when they "had vague discussions about going into business with one another and . . . there was no agreement to form" the competing company until after the defendants had left the company. 688 F. Supp. 2d at 652, 669. However, the actions taken by the defendants in *Abetter* and *Rimkus* are wholly distinguishable from those of Pearson and Van Zile.

As the court in *Abetter* stated, "there are recognized limitations on the conduct of an employee who plans to compete with his former employer." *Abetter*, 113 S.W.3d at 512. Conduct that goes beyond mere preparation includes "solicit[ing] [the company's] customers[.]" *Id.* (citations omitted). And as discussed, the evidence shows that Op29 solicited potential CXG customers as early as March 2020, while Pearson and Van Zile served as both officers and directors of CXG, and continued to do so through the date of the hearing on the Second Motion. *See supra* Section III.A.1.ii. Indeed, Op29 was engaged in building a website for a potential CXG client in March 2020, and was owed "[s]ystems fees" from a potential CXG client—AWIS. Doc. 49-31, Pls.' Mot. App., 234; Doc. 57-4, Pls.' Reply App., 301–02; Doc. 57-5, Pls.' Reply App., 305–06. This is ample

evidence of competition beyond mere planning. Accordingly, Plaintiffs have shown that Pearson and Van Zile breached their fiduciary duties not to compete with CXG.

Second, Defendants argue that there is no evidence of any other breach of fiduciary duty. Doc. 54, Defs.' Resp., 16. The Court, however, finds ample evidence that Pearson and Van Zile breached their fiduciary duties beyond competing with CXG. Indeed, Pearson and Van Zile "owe[d] [CXG] loyalty and good faith, integrity of the strictest kind, fair, honest dealing, and the duty not to conceal matters which might influence [their] actions to [CXG]'s prejudice." *Hartford Cas. Ins. Co. v. Walker Cnty. Agency, Inc.*, 808 S.W.2d 681, 688 (Tex. App.—Corpus Christi 1991, no writ) (citing *Douglas v. Aztec Petroleum Corp.*, 695 S.W.2d 312, 319 (Tex. App.—Tyler 1985, no writ)). Accordingly, they were obligated "to deal openly [with CXG] and to make full disclosure . . . about matters affecting [CXG]'s business." *Bray v. Squires*, 702 S.W.2d 266, 270 (Tex. App.—Houston [1st Dist.] 1985, no writ). Here, the evidence supports a finding that Pearson and Van Zile intentionally delayed the delivery of SmartE, misled CXG and Lindsey, and utilized CXG's resources in support of their plan to establish Op29.

CXG tasked Pearson and Van Zile with overseeing the development of SmartE as "an innovative enrollment web application designed to accommodate all types of agencies in the American healthcare market." Doc. 49-14, Pls.' Mot. App., 155; *see also* Doc. 49-10, Pls.' Mot. App., 93 (Defendants' response to interrogatory listing Pearson and Van Zile as "[i]ndividuals contributing content" to SmartE). Instead of working to deliver SmartE for CXG, however, Pearson and Van Zile sought to "[e]xtend time without any . . . changes" while they planned "to open up insurance with different funding support[.]" Doc. 49-19, Pls.' Mot. App., 182 (messages between Pearson and Van Zile). While promoting the image that they were "still pushing hard on the development of" SmartE,

Doc. 49-17, Pls.' Mot. App., 169, Pearson and Van Zile were, in reality, evolving Op29 from an idea to a functional, competing entity. *See, e.g.*, Doc. 49-24, Pls.' Mot. App., 206 (reflecting formation of Op29 on February 5, 2020); Doc. 49-15, Pls.' Mot. App., 209 (reflecting registration for Op29's website domain operation29.com); Doc. 57-1, Pls.' Reply App., 290 (stating that memberportalaccess.com is "powered by Op29"); Doc. 57-4, Pls.' Reply App., 301 (declaring that files related to memberportalaccess.com were "last modified on March 23, 2020").

When Pearson and Van Zile ultimately made their deception known through the August Letter, CXG was left without a marketable platform and without its President and COO, who oversaw development of such a marketable platform. Additionally, CXG was left in a position where it had to immediately compete against Op29. And while the Court will not go so far as to definitively agree with Plaintiffs' allegations of "data theft," Doc. 48, Pls.' Mot., 15, it is notable that Op29 marketed a platform that "appear[ed] nearly identical to" the design for SmartE. *See id.* at 6–7. Ownership issues aside, this evidence demonstrates that Pearson and Van Zile gave to Op29 what they had promised to deliver to CXG, and that CXG faced a significant disadvantage as a consequence.

Incredibly, Defendants argue that Pearson and Van Zile were "not breaching fiduciary duties" through their deceptive conduct because "[s]alaried employees across the country routinely take personal time during work hours, whether to go to the doctor or interview for a different job." Doc. 54, Defs.' Resp., 16. The Court rejects this argument. By all accounts, Pearson and Van Zile were not merely taking "personal time." Rather, they were actively engaged in both a plan to compete with CXG and a scheme to conceal that plan from CXG and Lindsey. By continuously promising to deliver SmartE—while knowing they would not deliver it—Pearson and Van Zile knowingly

hindered CXG's ability to compete in the market. And by abruptly leaving without delivering SmartE, Pearson and Van Zile left CXG without any ability to react to its lack of a marketable platform. Upon Pearson and Van Zile's exodus, CXG employees "were left with an unfinished product that [they then had] to go back, understand the code, recode, and finish it." Doc. 66, Tr., 57:9–11. To do so, CXG had to find and hire a "technical project manager." *Id.* at 66:7–16. At the time of the hearing, CXG estimated it needed "9 to 15 additional months" to develop a competitive platform. *See id.* at 58:11–12.

The Court recognizes that certain unforeseen circumstances may require an abrupt departure from one's employment, leaving the employer at a disadvantage. Here, the evidence demonstrates that Pearson and Van Zile's departure was not the result of unforeseen circumstances, but was rather a step in their plan to form a competing business, which they at least knew, if not intended, would leave CXG at a competitive disadvantage. Such actions are clear examples of conduct that constitute breaches of Pearson and Van Zile's fiduciary duties of "loyalty and good faith, integrity of the strictest kind, fair, honest dealing, and the duty not to conceal matters which might influence [their] actions to [CXG]'s prejudice." *Hartford Cas.*, 808 S.W.2d at 688 (citation omitted).

In sum, Plaintiffs have successfully shown a substantial likelihood that Pearson and Van Zile breached their fiduciary duties to CXG.

### iii.   *Plaintiffs were damaged.*

Finally, Plaintiffs have shown a substantial likelihood of damages suffered from these breaches, as explained below in the Court's discussion of the substantial threat of irreparable injury. *See infra* Section III.B.

Accordingly, the Court finds that Plaintiffs have established a likelihood of success on their

claims for breach of fiduciary duty against Pearson and Van Zile.

B.   *Plaintiffs Have Demonstrated Irreparable Harm.*

Next, Plaintiffs have demonstrated a substantial threat of irreparable harm absent a preliminary injunction. In order to establish irreparable harm, Plaintiffs must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *TRAVELHOST, Inc. v. Figg*, 2011 WL 6009096, at *4 (N.D. Tex. Nov. 22, 2011) (citing *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986)). This is a heavy burden to overcome, and mere speculative injury will not suffice. *Id.* "While courts are willing to entertain a loss of customers or goodwill as a harm, the movant must come forward with evidence that such an injury is irreparable by showing that the loss cannot be measured in money damages." *Digit. Generation Inc. v. Boring*, 869 F. Supp. 2d 761, 778 (N.D. Tex. 2012) (citation omitted). Here, Plaintiffs contend that they face a risk of irreparable harm absent an injunction due to the ongoing, and potentially continued, diversion of CXG's customers by Op29. In light of the circumstances and evidence presented, the Court agrees.

Defendants do not deny that Plaintiffs were harmed by Pearson and Van Zile's breaches, but instead claim that there is no threat of irreparable injury "because any alleged injury has already occurred." Doc. 54, Defs.' Resp., 20. However, the evidence shows that the injuries to CXG are ongoing. As discussed, Pearson and Van Zile delayed development of SmartE while they worked to establish Op29. Pearson and Van Zile ultimately left CXG to compete with CXG through Op29, in breach of the Company Agreement and their fiduciary duties. Their exodus left CXG without a working SmartE platform and at a "competitive disadvantage with" Op29, given that Op29 "ha[s] an operating platform," and CXG does not. Doc. 66, Tr., 58:1, 10. Such a disadvantage is especially

harmful in the healthcare-insurance industry, where "it's nearly impossible to get [clients] to actually switch platforms" once they have enrolled onto another. *Id.* at 58:23–24. This is primarily due to the large amount of data managed by a CRM platform and the fact that clients typically contract to enroll in a platform for "12 months to 24 months[.]" *Id.* at 59:2. And as of the date of the hearing, CXG still needed "9 to 15 additional months" to develop a competitive platform. *Id.* at 58:11. While CXG works to develop a marketable platform, Op29 is able to secure CXG's potential clients, making it "nearly impossible" for CXG "to get them to actually switch platforms" by the time CXG's platform is ready. *Id.* at 58:23–24. Plaintiffs have successfully shown that Op29 was actively competing and attempting to divert potential clients, for example, through the evidence of Van Zile and Jordan's communications with Mr. Duly. *See* Doc. 57-5, Pls.' Reply App., 305–06.

This kind of harm is inherently difficult, if not impossible, to calculate in monetary damages. For example, there is no way of adequately valuing the loss of goodwill, reputation, and opportunities to expand or renew services with potential clients. *See Pfeiffer v. Ajamie PLLC*, 469 F. Supp. 3d 752, 764 (S.D. Tex. 2019) ("The loss of reputation, goodwill, and clients . . . further establishes irreparable harm." (citations omitted)). Indeed, numerous federal courts in Texas have held that harm arising out wrongful competition is the "epitome of irreparable injury." *See, e.g., Am. Express. Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996); *Amerispec, Inc. v. Metro Inspection Servs., Inc.*, 2001 WL 770999, at *6 (N.D. Tex. July 3, 2001); *Sirius Comput. Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 841 (W.D. Tex. 2015). And proof of ongoing competition "gives rise to a rebuttable presumption that the [plaintiff] is suffering irreparable injury." *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 236 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Likely economic injuries may also support a finding of irreparable harm especially if the economic losses are difficult

to quantify. *See Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989).

While CXG cannot presently provide a working platform for potential clients, as Defendants point out, Doc. 54, Defs.' Resp., 8, CXG is presently able to secure future commitments and business from potential clients to utilize CXG's platform once the software is fully developed. And as Plaintiffs demonstrated, CXG is attempting to do just that. As discussed, CXG employees "me[t] with Premier" on February 25, 2021, "to be a potential client of [CXG's] platform" and "a contact resource for additional clients." Doc. 66, Tr., 57:17, 23–24. However, the competitive advantages Op29 enjoys, stemming directly from Pearson and Van Zile's breaches of the Company Agreement and of their fiduciary duties, have harmed—and would continue to harm—CXG absent an injunction. After all, CXG and Op29 operate within the same industry, in the same area, and within the same general network of potential clients. Op29's ongoing competition constitutes irreparable harm, as Op29 can continue to divert CXG's potential clients while CXG works to "try to gain back market advantage, and investment opportunities" lost due to Pearson and Van Zile's breaches. Doc. 56, Pls.' Reply, 4. Accordingly, the Court finds that Plaintiffs have demonstrated a substantial risk of irreparable harm.

C.    *The Balance of Harms Weighs in Favor of a Preliminary Injunction.*

Next, the Court finds that the "threatened injury outweighs any harm the injunction might cause [Defendants.]" *Enrique Bernat*, 210 F.3d at 442. As discussed above, Plaintiffs face potential irreparable harm absent a preliminary injunction. The Court recognizes Defendants' concern that the injunction threatens to "put Mr. Pearson and Mr. Van Zile out of business." Doc. 66, Tr., 94:9–10. Under the circumstances, however, the Court finds that the injury Plaintiffs face absent a preliminary injunction outweighs the potential harm to Defendants.

-24-

As discussed, Pearson and Van Zile's deception and ultimate departure from CXG left CXG at a significant competitive disadvantage. Their actions threatened to put CXG out of business and, indeed, in the August Letter, Defendants' attorney even stated that CXG "isn't worth anything" after Pearson and Van Zile left. Doc. 49-28, Pls.' Mot. App., 225. Instead of accepting potential demise, however, CXG sought out and hired a technical project manager to develop a working platform, Doc. 66, Tr., 66:7, worked to "understand the [SmartE] code, recode, and finish it," *id.* at 57:9–11, and attempted to solicit potential clients. *Id.* at 57:13–18. These efforts are aimed at undoing the ongoing damage caused by Pearson and Van Zile's wrongful conduct and have undoubtedly cost CXG additional time, money, and resources. Without a preliminary injunction, CXG stands to lose its business, as well as the additional resources expended to remedy the damage.

Moreover, pursuant to the Company Agreement, Pearson and Van Zile still have a combined thirty-percent interest in CXG and therefore stand to benefit from CXG's success. Doc. 49-2, Pls.' Mot. App., 39. The same cannot be said for Plaintiffs regarding the success of Op29. Accordingly, the threatened injury to Plaintiffs outweighs the potential harm that the preliminary injunction might cause Defendants.

D.      *A Preliminary Injunction Will Not Disserve the Public Interest.*

Finally, a preliminary injunction in this case will not disserve the public interest. "It is in the public interest to uphold contracts[.]" *Amerispec, Inc.*, 2001 WL 770999, at *6. "Moreover, the public has an interest in knowing and understanding that persons who breach their agreements may not illegally profit or otherwise benefit from such conduct." *Le-Vel Brands, LLC v. Bland*, 2019 WL 4753041, at *10 (N.D. Tex. Sept. 30, 2019). Here, in accordance with the public interest, the Court opts to uphold the Company Agreement and to hold Pearson and Van Zile to their fiduciary duties.

The public interest is served by restricting Pearson and Van Zile's ability to benefit from their wrongful conduct. Thus, the "public interest" element weighs in favor of the preliminary injunction.

In conclusion, the Court finds that Plaintiffs have met their burden of showing that: (1) they are likely to succeed on their claims against Pearson and Van Zile for breach of contract and breach of fiduciary duty; (2) Plaintiffs will suffer irreparable harm absent the injunction; (3) the balance of harms weighs in favor of issuing the injunction; and (4) the injunction will not disserve the public interest. Accordingly, the preliminary injunction is proper.

E.      *The Scope of the Injunction Is Appropriate.*

The Court finds that the preliminary injunction issued at the end of the hearing is sufficiently narrow and is "dictated by the extent of the violation established[.]" *See Califano*, 442 U.S. at 702.

As discussed, Pearson and Van Zile likely breached the Company Agreement and their fiduciary duties by competing with CXG through their involvement with Op29. They also breached their fiduciary duties in the execution of their deceptive scheme. Moreover, because Op29, Jordan, PHI, VZL, GBM, and CyberX all acted "in active concert or participation with" Pearson and Van Zile, the Court need not address the remaining claims to enjoin all Defendants. *See* Fed. R. Civ. P. 65(d)(2); *see also Waffenschmidt*, 763 F.2d at 717.

It is thus proper to preliminarily enjoin all named Defendants from utilizing any CRM software that Pearson and Van Zile developed, or helped develop, while they wrongfully competed with CXG. *See Brink's Inc. v. Patrick*, 2014 WL 2931824, at *6 (N.D. Tex. June 27, 2014). Additionally, while the Court does not definitively find at this juncture that CXG owns SmartE, Pearson and Van Zile breached their fiduciary duties by delaying its development while at the same time providing Op29 with a platform that is "nearly identical" to SmartE. Doc. 48, Pls.' Mot., 6–7.

-26-

Pearson and Van Zile thus gave the advantage to Op29 that they promised to give to CXG, and the Court finds it proper to preliminarily enjoin Defendants' ability to profit from any software that was derived from the development of the SmartE software. Therefore, the preliminary injunction is proper, as it is directly related to the violations established. *See Califano*, 442 U.S. at 702.

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTED** Plaintiffs' Second Motion for Preliminary Injunction (Doc. 48). Accordingly, the Court **PRELIMINARILY ENJOINS** Defendants, their agents, servants, employees, attorneys, and all others in active concert or participation with Defendants:

1. From, within the insurance services field, either directly or indirectly, selling marketing, licensing, or purporting to license any CRM software, CRM software as a service, or CRM software development services that includes any software that was developed by, with the assistance of, or under the supervision of Pearson and/or Van Zile from January 9, 2017 through the present; and

2. From either directly or indirectly, selling marketing, licensing, or purporting to license any software or software as a service that was derived from the SmartE software.

SO ORDERED.

SIGNED: May 17, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE